No. 13-2028

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHEVRON CORPORATION,

*Petitioner-Appellee*,

v.

AARON MARR PAGE,

*Respondent-Appellant*,

and

ECUADORIAN PLAINTIFFS,

*Interested Parties-Appellants.*

On Appeal From The United States District Court
For The District Of Maryland

## BRIEF OF APPELLEE CHEVRON CORPORATION

Peter E. Seley
Thomas H. Dupree, Jr.
Claudia M. Barrett
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Attorneys for Appellee Chevron Corporation*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-2028  Caption: Chevron Corp. v. Aaron Marr Page                    .

Pursuant to FRAP 26.1 and Local Rule 26.1,

 Chevron Corporation
(name of party/amicus)

who is  appellee                    , makes the following disclosure:
        (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly         ☑ YES  ☐ NO
    held entity?

2.  Does party/amicus have any parent corporations?                       ☐ YES  ☑ NO
    If yes, identify all parent corporations, including grandparent and great-
    grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a              ☐ YES  ☑ NO
    publicly held corporation or other publicly held entity?
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly        ☐ YES  ☑ NO
    held entity that has a direct financial interest in the outcome

of the litigation (Local Rule 26.1(b))?

If yes, identify entity and nature of interest:


5.  Is party a trade association? (amici curiae do not complete this    ☐ YES ☒ NO
    question)
    If yes, identify any publicly held member whose stock or equity value could be
    affected substantially by the outcome of the proceeding or whose claims the
    trade association is pursuing in a representative capacity, or state that there is no
    such member:


6.  Does this case arise out of a bankruptcy proceeding?    ☐ YES ☒ NO
    If yes, identify any trustee and the members of any creditors' committee:

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

STATEMENT OF JURISDICTION.................................................... 4

STATEMENT OF THE ISSUES........................................................ 5

STATEMENT OF THE CASE............................................................ 5

STATEMENT OF FACTS ................................................................. 5

    I.    The Fraudulent Lago Agrio Litigation and Judgment ........................ 6

        A.    Initial Revelations of Fraud ....................................... 7

        B.    Judgment Fraud ......................................................... 11

    II.    Page's Role in the Fraud .................................................... 13

    III.    The RICO Action And The First Subpoena To Page.......................... 14

    IV.    The Instant Action ............................................................. 17

SUMMARY OF ARGUMENT .......................................................... 20

STANDARD OF REVIEW ................................................................ 22

ARGUMENT ................................................................................... 23

    I.    THE PRIVILEGE ISSUES WERE RIPE FOR DETERMINATION.................................................................... 23

    II.    THE MAGISTRATE JUDGE DID NOT ABUSE HIS DISCRETION IN FINDING THAT PRIVILEGE HAD BEEN WAIVED ON MULTIPLE GROUNDS.......................................... 25

        A.    The Donziger Waiver Encompasses Page, Who Worked Under Donziger's Direction On The Ecuadorian Litigation. ................................................................. 25

i

**TABLE OF CONTENTS**
(continued)

**Page**

B.     The Crime-Fraud Exception Provides An Additional And Independent Basis For Waiver.................................................36

C.     The Magistrate Judge Correctly Found Waiver Based On Disclosure To Third Parties. ....................................................47

CONCLUSION ..................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chaudhry v. Gallerizzo*,
 174 F.3d 394 (4th Cir. 1999) ................................................................36

*Chevron Corp. v. Camp*,
 Nos. 10-mc-27,-28, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010) ............. 4, 24

*Chevron Corp. v. Donziger*,
 783 F. Supp. 2d 713 (S.D.N.Y. 2011) ..................................................6

*Chevron Corp. v. Donziger*,
 886 F. Supp. 2d 235 (S.D.N.Y. 2012) ........................................... passim

*Chevron Corp. v. Donziger*,
 No. 11 Civ. 0691, 2013 WL 646399 (S.D.N.Y. Feb. 21, 2013) ........................43

*Chevron Corp. v. Donziger*,
 768 F. Supp. 2d 581 (S.D.N.Y. 2011) ........................................... passim

*Chevron Corp. v. Donziger*,
 871 F. Supp. 2d 229 (S.D.N.Y. 2012) ..............................................16

*Chevron Corp. v. Donziger*,
 No. 11 Civ. 0691, 2013 U.S. Dist. LEXIS 55877 (S.D.N.Y. Apr. 12, 2013) ......21

*Chevron Corp. v. Donziger*,
 No. 11 Civ. 0691, 2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013)......... 3, 5, 42, 43

*Chevron Corp. v. Donziger*,
 No. 11 Civ. 0691, 2013 WL 5575833 (S.D.N.Y. Oct. 10, 2013)................... 5, 38

*Chevron Corp. v. E-Tech Int'l*,
 No. 10-cv-1146, 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010).........................7

*Chevron Corp. v. Naranjo*,
 667 F.3d 232 (2d Cir. 2012) ......................................................... 6, 16

iii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chevron Corp. v. Salazar*,
275 F.R.D. 437 (S.D.N.Y. 2011).........................................................30

*Chevron Corp. v. Stratus Consulting, Inc.*,
No. 10-cv-00047, 2010 WL 3923092 (D. Colo. Oct. 1, 2010) ...........49

*Chevron Corp. v. Weinberg Group*,
682 F.3d 96 (D.C. Cir. 2012) ..............................................................42

*Fonar Corp. v. Johnson & Johnson*,
227 U.S.P.Q. 886 (D. Mass. 1985).....................................................29

*Genentech, Inc. v. ITC*,
122 F.3d 1409 (Fed. Cir. 1997) ..........................................................23

*In re Chevron Corp.*,
633 F.3d 153 (3d Cir. 2011) ...............................................................10

*In re Chevron Corp.*,
No. 11-24599-CV, 2012 WL 3636925 (S.D. Fla. June 12, 2012) ................. 3, 43

*In re Chevron Corp.*,
Nos. 1:10-mc-00021,-22, 2010 WL 9545704 (D.N.M. Sept. 13, 2010)......... 4, 11

*In re Chevron Corp.*,
650 F.3d 276 (3d Cir. 2011) ...............................................................49

*In re Chevron Corp.*,
709 F. Supp. 2d 283 (S.D.N.Y. 2010) ........................................... 6, 15

*In re Chevron Corp.*,
749 F. Supp. 2d 170 (S.D.N.Y. 2010) ........................................ passim

*In re Chevron Corp.*,
No. 1:10-mc-00002-LAK, D.E. 199 (S.D.N.Y. Aug. 16, 2011).........29

*In re Chevron Corp.*,
No. 10-cv-2675, D.E. 33 (D.N.J. June 11, 2010)...............................10

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Chevron Corp.*,
No. H-10-134, D.E. 107 (S.D. Tex. Jan. 10, 2011) ............................................48

*In re Chevron Corp.*,
Nos. 1:10-mc-00021,-22, D.E. 77 (D.N.M. Sept. 2, 2010) ..............................1, 4

*In re Doe*,
662 F.2d 1073 (4th Cir. 1981) ......................................................................36

*In re Grand Jury Investigation,*
352 F. App'x 805 (4th Cir. 2009) ................................................................45

*In re Grand Jury Proceedings #5,*
401 F.3d 247 (4th Cir. 2005) .......................................................................36

*In re Grand Jury Proceedings,*
33 F.3d 342 (4th Cir. 1994) ..........................................................21, 22, 36

*In re Grand Jury Subpoena*,
341 F.3d 331 (4th Cir. 2003) .......................................................................22

*In re Grand Jury Subpoena: Under Seal*,
415 F.3d 333 (4th Cir. 2005) .......................................................................22

*In re Weiss*,
596 F.2d 1185, 1186 (4th Cir. 1979) ...........................................................23

*International Union of Operating Engineers v. Philip Morris*,
No. 3:97-0708, 1999 WL 33659387 (S.D. W.Va. June 28, 1999) ......................32

*Lago Agrio Plaintiffs v. Chevron Corp.*,
409 F. App'x 393 (2d Cir. 2010) .............................................................26, 27

*Leonen v. Johns-Manville*,
135 F.R.D. 94 (D. N.J. 1990) ......................................................................32

*Olvera v. County of Sacramento*,
No. Civ. S-10-0550, 2011 U.S. Dist. LEXIS 144598 (E.D. Cal. Dec. 15,
2011) ........................................................................................................25

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Shahinian v. Tankian,*
　242 F.R.D. 255 (S.D.N.Y. 2007)..........................................................44

*Sheet Metal Workers International Ass'n v. Sweeney,*
　29 F.3d 120 (4th Cir. 1994)............................................... 22, 36, 47

*Transamerica Computer Co. v. IBM Corp.,*
　573 F.2d 646 (9th Cir. 1978)...............................................................32

*United States v. Cohn,*
　303 F. Supp. 2d 672 (D. Md. 2003) ...................................................47

*United States v. Kaplan,*
　No. 02 Cr. 883(DAB), 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ...............44

**Statutes**

28 U.S.C. § 1291 ....................................................................................4

28 U.S.C. § 1331 ....................................................................................4

28 U.S.C. § 1782.......................................................................... passim

**Rules**

Fed. R. Civ. P. 26(b)(5)........................................................................26

Fed. R. Evid. 502(a)...............................................................................48

Local Civil Rule 26.2 .............................................................................26

## INTRODUCTION

This is another appeal arising from Aaron Page's continued efforts to frustrate the enforcement of a valid subpoena. As in his related appeal pending before this Court (No. 13-1382), Page raises a host of meritless challenges to the magistrate judge's order directing him to produce documents.

Page worked first as an intern and then as a lawyer under the direct supervision and control of attorney Steven Donziger — a key player in the scheme to procure a fraudulent $19 billion judgment against Chevron by a court in Lago Agrio, Ecuador. As several federal courts throughout the country have recognized, Chevron has uncovered evidence that Donziger, working with other attorneys and consultants, engaged in intimidation of judges, bribery, fabrication of evidence, and the secret and unlawful ghostwriting of judicial documents in pursuit of the corrupt, multibillion-dollar judgment against Chevron. The scope of the fraud and the evidence of the Ecuadorian Plaintiffs' lawyers engaging in "inappropriate, unethical and perhaps illegal conduct" has sent "shockwaves through the nation's legal communities." *In re Chevron Corp.*, Nos. 1:10-mc-00021,-22, Docket Entry ("D.E.") 77 at 3-4 (D.N.M. Sept. 2, 2010) (reproduced at JA 728 – 739).

After Chevron uncovered the fraud, it sued Donziger and others in the Southern District of New York, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), among other claims. In connection with that

1

lawsuit, Chevron served Page with a subpoena seeking documents concerning Page's role in helping Donziger procure the fraudulent Ecuadorian judgment. The magistrate judge overruled Page's baseless claims of "privilege" and ordered him to produce the documents. The district court upheld the magistrate judge in full. That order is the subject of the related appeal in No. 13-1382.

The separate subpoena that is the subject of the instant appeal was issued pursuant to 28 U.S.C. § 1782 — the federal statute allowing parties to obtain discovery in the United States for use in foreign proceedings. Chevron sought documents from Page for use in the Ecuadorian litigation itself, as well as in an international arbitration pending in The Hague.

Incredibly, Page attempted to obstruct the second subpoena by asserting the same baseless "privilege" claims that the magistrate judge had already rejected. The magistrate judge nonetheless convened another hearing, at the close of which he again overruled Page's objections, noting the substantial evidence of fraud and Page's close involvement in the ghostwriting scheme. The district court again upheld the magistrate judge's order in full.

Most of the arguments Page raises in this appeal are identical to the ones he presents in No. 13-1382 — and all should be rejected. The magistrate judge identified *three* separate and independent bases for his conclusion that any privilege that governed Page's documents has been waived. First, Judge Lewis A.

Kaplan, the judge presiding over the RICO litigation in New York, previously held that Donziger — who directed and supervised Page's work — had waived any applicable privileges or protections concerning documents related to the fraudulent scheme. That waiver encompasses documents possessed by Page, who worked as Donziger's intern and associate on the Ecuadorian litigation. Second, the magistrate judge determined that the crime-fraud exception provides an additional ground for waiver. Page was integral to the fraudulent scheme — indeed, he authored one of the documents that was copied into the fraudulent Ecuadorian judgment itself — and Chevron has made out far more than the prima facie case of fraud necessary to invoke the exception. Third, the magistrate judge held that Page's and the Ecuadorian Plaintiffs' disclosures to third parties effected a subject-matter waiver, vitiating any privilege or protection that would otherwise apply.

Page's claim that this is a "manufactured scandal," Page Br. 6, is false. Numerous federal courts, like the magistrate judge and district court below, have found the Ecuadorian litigation rife with fraud.[1]  And several have similarly

---

[1]  *See, e.g.*, *Chevron Corp. v. Donziger*, No. 11 Civ. 0691, 2013 WL 1087236, at *6-*10 (S.D.N.Y. March 15, 2013); *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 292 (S.D.N.Y. 2012); *In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925 at *14 (S.D. Fla. June 12, 2012); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011); *Chevron Corp. v. E-Tech Int'l*, No. 10-cv-1146, 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Chevron*

[Footnote continued on next page]

invoked the crime-fraud exception in overriding claims of privilege.[2]  This Court

should reach the same conclusion already reached by other federal courts and

affirm the judgment below.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction under 28 U.S.C. § 1331,

as this case arises from an application for a subpoena pursuant to 28 U.S.C. § 1782.

The district court entered final judgment on July 17, 2013 (JA 16) and Page timely

noticed an appeal on August 16, 2013.  JA 13-15.[3]  This Court has jurisdiction

under 28 U.S.C. § 1291.

---

[Footnote continued from previous page]
 *Corp.*, Nos. 1:10-mc-00021,-22, D.E. 77 at 3-4 (D.N.M. Sept. 2, 2010);
 *Chevron Corp. v. Camp*, Nos. 10-mc-27,-28, 2010 WL 3418394, at *6
 (W.D.N.C. Aug. 30, 2010); *In re Chevron Corp.*, No. 10-cv-2675, D.E. 33
 (D.N.J. June 11, 2010).

[2] *See, e.g.*, *In re Chevron Corp.*, No. 10-cv-2675, D.E. 33 at 43:15-17 (D.N.J.)
 ("[T]he Court is satisfied that an adequate prima facie demonstration of the
 operation of the crime-fraud exception indeed has been established here."); *In
 re Chevron Corp.*, Nos. 1:10-mc-00021,-22, 2010 WL 9545704, at *7 (D.N.M.
 Sept. 13, 2010) ("The Court concludes that these discussions trigger the crime-
 fraud exception, because they relate to corruption of the judicial process, the
 preparation of fraudulent reports, the fabrication of evidence, and the
 preparation of the purported expert reports by the attorneys and their
 consultants.").

[3] Two of the Ecuadorian Plaintiffs — Hugo Gerardo Camacho Naranjo and
 Javier Piaguaje Payaguaje — appeared as "Interested Parties" below and joined
 Page in noticing an appeal.

## STATEMENT OF THE ISSUES

I.     Whether Page's privilege claims were ripe for decision.

II.     Whether the magistrate judge abused his discretion in finding that any applicable privilege concerning Page's documents had been waived on multiple grounds.

## STATEMENT OF THE CASE

On November 1, 2011, Chevron filed in the District of Maryland an application to obtain discovery from Aaron Page for use in foreign proceedings, pursuant to 28 U.S.C. § 1782.  JA 58 – 87.  On January 25, 2013, Magistrate Judge Charles B. Day granted Chevron's application, deemed the subpoena served, and ordered Page to produce responsive documents.  JA 2625 – 2633.  Page filed Rule 72 objections to the magistrate judge's order.  On July 17, 2013, District Judge Roger W. Titus affirmed Magistrate Judge Day's order in its entirety.  JA 16.

## STATEMENT OF FACTS

The history of the Ecuadorian litigation which forms the basis for this and related proceedings is long.  Accordingly, Chevron sets forth herein only those facts relevant to this appeal.  For an overview of the litigation and the fraud that has been perpetrated by the Ecuadorian Plaintiffs, *see Chevron Corp. v. Donziger*, No. 11 Civ. 0691, 2013 WL 5575833 (S.D.N.Y. Oct. 10, 2013); *Chevron Corp. v. Donziger*, No. 11 Civ. 0691, 2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013); *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235 (S.D.N.Y. 2012); *Chevron Corp.*

*v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011), *rev'd on other grounds sub nom.*, *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012).

## I.    The Fraudulent Lago Agrio Litigation and Judgment

On February 14, 2011, a court in Lago Agrio, Ecuador issued a $19 billion judgment against Chevron in an action relating to oil exploration activities by a consortium operating from 1967 until 1990.  JA 874 – 1061.  The consortium ultimately was comprised of Ecuador's national oil producer, Petroecuador, and Texaco Petroleum Company ("TexPet"), a fourth tier subsidiary of Texaco.[4]  After TexPet's concession contract with Ecuador ended, TexPet conducted remediation and the Government of Ecuador released TexPet from all liability for environmental harms.  *In re Chevron Corp.*, 709 F. Supp. 2d 283, 286-87 (S.D.N.Y. 2010), *aff'd* 629 F.3d 297 (2d Cir. 2011).  Despite TexPet's remediation and Ecuador's release, the Ecuadorian Plaintiffs filed suit in 2003, naming Chevron as the sole defendant in that action.  *See Chevron Corp. v. Donziger*, 783 F. Supp. 2d 713, 716 (S.D.N.Y. 2011).  It is in the context of these dubious beginnings that the Lago Agrio case proceeded.

---

[4]  In 2001, Chevron acquired the stock of Texaco via a reverse-triangular merger.

### A.    Initial Revelations of Fraud

During the Lago Agrio litigation, the Ecuadorian Plaintiffs pressured the Ecuadorian court to stop the evidence-gathering process known as "judicial inspections" by threatening to file an ethics complaint against the judge.  *Donziger*, 886 F. Supp. 2d at 288-89; *see also Donziger*, 768 F. Supp. 2d at 606-07, 611. Then, at the Ecuadorian Plaintiffs' request, the Ecuadorian court appointed a purportedly independent court expert named Richard Stalin Cabrera Vega to conduct an official "global assessment" of the harms allegedly caused by TexPet in the Oriente region.  *In re Chevron Corp.*, 749 F. Supp. 2d 141, 144 (S.D.N.Y. 2010), *aff'd sub nom Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

Through other discovery proceedings under 28 U.S.C. § 1782, Chevron later discovered that Cabrera was not in fact independent, as he had often represented in Ecuadorian court filings, but that he was secretly paid by the Ecuadorian Plaintiffs and operated at their direction, going so far as permitting them to ghostwrite his official report and then fraudulently presenting it as his independent work while denying any relationship with the Ecuadorian Plaintiffs.  *See, e.g.*, *Chevron Corp. v. E-Tech Int'l*, No. 10-cv-1146, 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010) ("There is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-

appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own."). The Ecuadorian Plaintiffs' lawyers themselves recognized the seriousness of this discovery by Chevron, writing in an internal email to Donziger that "the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)." JA 527 – 529. Earlier this year, two of the authors of the ghostwritten Cabrera Report, Douglas Beltman and Ann Maest, declared under oath that they ghostwrote the Cabrera Report, that it was based on assumptions provided by Donziger with no scientific basis, and that they disavowed it in its entirety. *See Chevron Corp. v. Donziger*, No. 11 Civ. 0691, D.E. 1007-1 at Ex. 3652, ¶¶ 15, 57, 73, 76 (S.D.N.Y. Apr. 12, 2013); *id.* at Ex. 3653, ¶¶ 8-9, 13-15, 27, 38, 50.

Additional evidence of fraud obtained by Chevron includes outtakes[5] from a film called *Crude*, instigated and funded by the Ecuadorian Plaintiffs themselves, which actually capture the fraud on film, and include scenes that show:

- The Ecuadorian Plaintiffs secretly meeting with Cabrera, prior to his appointment by the Ecuadorian court, to plan the purportedly independent report (JA 146 at CRS-191-00-CLIP-02 and JA 183 (Cabrera introducing himself at Ecuadorian Plaintiffs' secret meeting,

---

5   For the Court's convenience, Chevron has included in the Joint Appendix the actual video clips of the outtakes in the record below. The clips were filed in a separate Exhibit Volume and are designated JA 146, JA 1725, JA 2208 and JA 2891. Transcripts of the video clips are also included in the Joint Appendix at JA 148 – 227, JA 1728 – 1732, JA 2211 – 2212, and JA 2893.

weeks before he was appointed as the "independent" court expert);  JA 146 at CRS-189-00-CLIP-02 and JA 173 – 177 (secret meeting in which Donziger describes global expert report work, then states to Cabrera, "… and Richard, of course you really have to be comfortable with all that…"); JA 146 at CRS-191-00-CLIP-03 and JA 185 – 188 (secret meeting during which Ecuadorian Plaintiffs' counsel explains that his team will write the report for Cabrera);

- Donziger describing how he was going to influence the judge to rule in his favor through "pressure, intimidation and humiliation" (*Donziger*, 768 F. Supp. 2d at 612 (internal quotation marks omitted));

- Donziger stating that the Ecuadorian Plaintiffs need to "mobilize the country politically so that no judge can rule against [us] and feel like he can get away with it in terms of his career" (*id.*) (internal quotation marks and alteration omitted);

- Donziger and other members of the Ecuadorian Plaintiffs' team discussing how the Ecuadorian judge thinks he might be killed if he rules against the Ecuadorian Plaintiffs, to which Donziger responds, "He might not be . . ., but . . . he thinks he will be . . . which is just as good" (*id.* at 613) (internal quotation marks omitted); and

- Donziger and the Ecuadorian Plaintiffs' consultants explicitly acknowledging that the scientific evidence purporting to support their claims is, in their words, "just a bunch of smoke and mirrors and bullshit" (JA 146 at CRS-195-05-CLIP-01 and JA 197 – 205).

*See also Donziger*, 768 F. Supp. 2d at 604-11 (recounting evidence of fraud as reflected in *Crude* outtakes).  The *Crude* outtakes also show Page referring to the Ecuadorian Plaintiffs' "radical" scientific experts and the corruption of the judiciary (JA 146 at CRS-39-1-CLIP-02 and JA 150 – 151), and being present at the filing of the Cabrera report, with Cabrera, despite the fact that no one was supposed to be told ahead of time exactly when the Cabrera report would be filed (JA 146 at CRS-448-00-CLIP-03).

9

Courts presiding over these Section 1782 proceedings have recognized the nature and extent of the fraud, finding that "[t]here is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own." *E-Tech Int'l*, 2010 WL 3584520, at *6. As one federal court stated, in rejecting the Ecuadorian Plaintiffs' argument that Ecuadorian proceedings were governed by different norms, "the concept of fraud is universal, and [ ] what has blatantly occurred in this matter would in fact be considered fraud by any court." *Chevron Corp. v. Camp*, Nos. 1:10-mc-27, -28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010).

Other federal courts have reached the same conclusion, invoking the crime-fraud exception to overrule claims of privilege. *See, e.g.*, *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011) ("[W]e believe that this showing . . . is sufficient to make a prima facie showing of a fraud that satisfies the first element of the showing necessary to apply the crime-fraud exception to the attorney-client privilege."); *In re Chevron Corp.*, No. 10-cv-2675, D.E. 33 at 44:11-16 (D.N.J. June 11, 2010) ("[T]he provision of materials and information by consultants on the litigation team of the Lago Agrio plaintiffs in what appears to be a secret and an undisclosed aid of a supposedly neutral court-appointed expert in this Court's view constitutes a prima facie demonstration of a fraud on the tribunal."); *In re*

10

*Chevron Corp.*, 749 F. Supp. 2d at 167 ("[T]here is more than a little evidence that [plaintiffs' counsel's] activities . . . come within the crime-fraud exception to both the privilege and to work product protection."); *In re Chevron Corp*., Nos. 1:10-mc-00021,-22, 2010 WL 9545704, at *7 (D.N.M. Sept. 13, 2010) ("The Court concludes that these discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the purported expert reports by the attorneys and their consultants.").

### B.    Judgment Fraud

In addition to the Cabrera fraud, forensic analysis has now demonstrated that the Ecuadorian Plaintiffs' attorneys also ghostwrote the Ecuadorian judgment itself.  The judgment contains substantial verbatim passages from the Ecuadorian Plaintiffs' lawyers' internal documents, including memoranda and data from internal spreadsheets and databases, none of which appear anywhere in the record. JA 531 – 559 (Expert Report of Robert Leonard); JA 561 – 580 (Expert Report of Michael Younger).

One of the documents copied in the judgment is a document referred to as the "Fusion Memo," which was authored by Page and which incorrectly purported to find Chevron liable for TexPet's alleged conduct despite the fact that Chevron did not succeed to Texaco's liabilities.  JA 273, 1367.  The Ecuadorian Plaintiffs

incorporated this flawed analysis verbatim into the judgment. *E.g.*, JA 543 – 544 (examples of identical or nearly identical word strings between the Fusion memo and the Ecuadorian judgment); JA 606 – 612 (same).

On January 3, 2012, an Ecuadorian appellate court affirmed the judgment, expressly refusing to consider the evidence of fraud submitted by Chevron, and instead explaining that those allegations and the relevant evidence were before the Southern District of New York in Chevron's RICO suit. JA 2848 ("[T]his Chamber has no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice"). Immediately after the appellate decision issued, the Ecuadorian Plaintiffs filed a motion for "amplification and clarification," asking the court to find that it had reviewed and rejected Chevron's allegations of fraud. JA 2871. Mere hours after briefing on the motion to clarify was completed, the appellate court declared that, contrary to its prior opinion, it had reviewed *some* of the fraud record and found "no reliable evidence" of "any crime" by the Ecuadorian Plaintiffs or their agents. JA 2873. Even then, however, the Ecuadorian appellate court reiterated that "it stays out of these accusations, preserving the parties' rights . . . to continue the course of the actions that have been filed in the United States of America." JA 2874. Chevron's cassation appeal to Ecuador's National Court of Justice remains pending.

## II.    Page's Role in the Fraud

Page has played an integral role in the Lago Agrio fraud.  He first began working for Steven Donziger the year he graduated from law school, and still works for him today.  JA 1205 – 1208.  From the beginning, Page worked on the Lago Agrio litigation under Donziger's direct supervision and control.  *Id.*; *see also* JA 1324 at 8-9 (unchallenged factual finding of magistrate judge that "all of the work that was performed here [by Page] was performed under Mr. Donziger").

Page helped develop what he described as "supplemental litigation strategies," including efforts to instigate an SEC investigation of Chevron, to charge Chevron with genocide to incite public outrage, and to concoct arguments as to why Texaco's remediation was supposedly fraudulent.  JA 65; JA 349 – 350.  Page was also instrumental in devising baseless claims that Chevron had violated the Foreign Corrupt Practices Act in an effort to pressure Chevron to settle the fraudulent Ecuador case.  He wrote a memorandum on the subject and argued that the Ecuadorian Plaintiffs should send it to the United States Government to advance their pressure campaign against Chevron, even though he admitted that they "lack[ed] clear evidence" that Chevron had violated the law.  JA 355 – 357.

Despite the fact that he has no scientific background, Page devised a $20 billion damages estimate for the Lago Agrio case, and pushed the baseless estimate to Donziger: "I really don't understand why you're shying away from going up on

the remediation estimate. Like I wrote earlier, while 20b can be attacked it can't be destroyed in a way that will embarrass us. This shit is really unprecedented, nobody has every [sic] 'pump-and-treat'-ed an ecosystem before. And I really think upping it will make media/court/CVX itself start thinking in terms of billions, albeit lower . . . ." JA 349.

Page also contributed to the fraud surrounding the judgment itself. He drafted the Fusion Memo, portions of which appear verbatim in the judgment despite having never been submitted to the Ecuadorian court. *See* JA 1303; JA 1331. He also helped write the "Draft Alegato," a legal brief that was not filed with the Ecuadorian court, which also contains language that was copied directly into the judgment. *See* JA 548 – 550; *see also* JA 1981 – 1995 (email showing Page's role in preparing the Draft Alegato); JA 2990 – 2991 (same).

## III.   The RICO Action And The First Subpoena To Page

On February 1, 2011, Chevron filed a complaint in the Southern District of New York alleging claims under RICO and state law and seeking a declaratory judgment and preliminary injunction enjoining enforcement of the Ecuadorian judgment. *Chevron Corp. v. Donziger*, No. 11 Civ. 0691, D.E. 1 (S.D.N.Y. Feb. 1, 2011). The case was assigned to Judge Kaplan, who had issued rulings compelling production of the *Crude* outtakes and granting Chevron discovery from Donziger

— both of which were affirmed by the Second Circuit. *See In re Chevron Corp.*, 749 F. Supp. 2d 141; *In re Chevron Corp.*, 709 F. Supp. 2d 283.

On March 7, 2011, Judge Kaplan issued a preliminary injunction restraining enforcement of the judgment. *See Donziger*, 768 F. Supp. 2d at 660. The court's ruling included detailed factual findings, frequently quoting the Ecuadorian Plaintiffs' own incriminating documents and the *Crude* outtakes. *See generally id*. The court concluded that Chevron was likely to prevail on its claim that Ecuador "does not provide impartial tribunals or procedures compatible with the requirements of due process of law," and that Chevron had "raised substantial questions that present a fair ground for litigation as to whether the Ecuadorian judgment is a result of fraud practiced on the Ecuadorian tribunal." *Id.* at 636-37 (internal quotation marks omitted). The declaratory judgment count, pursuant to which the preliminary injunction had been entered, was subsequently bifurcated (*Chevron Corp. v. Donziger*, No. 11 Civ. 0691, D.E. 278 (S.D.N.Y. Apr. 15, 2011)), and later severed at Donziger's request (*Chevron Corp. v. Donziger*, No. 11 Civ. 0691, D.E. 328 (S.D.N.Y. May 31, 2011)). The declaratory judgment count then proceeded as the separate action of *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (S.D.N.Y.).

On January 26, 2012, the Second Circuit remanded *Salazar* with instructions to dismiss the declaratory-judgment claim, while recognizing that Chevron would

proceed with its RICO claim (and other state-law claims). *Naranjo*, 667 F.3d 232.

The ruling was based purely on a procedural question — the availability of relief

under the New York Uniform Foreign Country Money-Judgments Recognition

Act. Nothing in the Second Circuit's opinion suggested that Judge Kaplan erred in

his factual findings, and the court did not rule on the merits of Chevron's RICO,

fraud, and other claims. *See id.* at 247 n.17; *see also Chevron Corp. v. Donziger*,

871 F. Supp. 2d 229, 238 (S.D.N.Y. 2012) ("The [Second Circuit's] opinion did

not pass, one way or the other, on this Court's findings with respect to the nature of

the Ecuadorian tribunals or the evidence of fraud in the procurement of the

Judgment.").

Chevron subpoenaed Page to obtain discovery for use in the New York

RICO action. Page refused to comply, leaving Chevron no choice but to file a

motion to compel in the District of Maryland where Page resides. On August 31,

2011, the magistrate judge ordered Page to comply with Chevron's subpoena. In

so ruling, the magistrate judge identified three independent bases for concluding

that the privileges claimed by Page had been waived. *See* JA 294 – 302. First, the

court explained that Judge Kaplan, in the New York RICO proceeding, had already

held that Donziger had waived any privilege attaching to documents in his

possession, custody and control. JA 294 (citing *In re Chevron Corp.*, 749 F. Supp.

2d 170, 185 (S.D.N.Y. 2010)). Because Page worked on the Lago Agrio litigation

under Donziger's direct control and supervision, the Donziger waiver encompassed documents held by Page. Indeed, those documents should already have been produced by Donziger and were therefore encompassed by the Donziger waiver. Second, the court held that the crime-fraud exception applied to vitiate any privilege, noting that Chevron had made out a prima facie case of fraud based on (among many other things) evidence that the Fusion Memo drafted by Page had reappeared verbatim in the judgment of the Ecuadorian court. JA 301 – 302. Third, the court held that any applicable privilege was waived as to documents that were disclosed to third parties, such as the purportedly "independent" expert Cabrera. JA 296 – 299.

The district court affirmed the magistrate judge's ruling, and that order is currently before this Court in No. 13-1382.

## IV.    The Instant Action

On November 1, 2011, Chevron filed in the District of Maryland an application under 28 U.S.C. § 1782 to obtain discovery from Page for use in the Ecuadorian litigation as well as in an international treaty arbitration pending in The Hague. *See In re Chevron Corp.*, No. 8:11-cv-0395 (D. Md.). Chevron requested the issuance of a second subpoena to Page because at that time discovery in the RICO action had been stayed, and Chevron had an immediate need for the documents in connection with the treaty arbitration and the appeal in the

17

Ecuadorian litigation.  The second subpoena sought many of the same documents called for by the first subpoena, although it sought some new ones as well.  JA 96 – 128.

Even though the magistrate judge had just rejected Page's "privilege" assertions as meritless, Page re-asserted them in objecting to the second subpoena. Following another hearing on January 25, 2013, the court again found that the Donziger waiver encompassed documents held by Page; that the crime-fraud exception applied; and that the disclosure of documents to third parties further waived any privilege that might otherwise have attached.  JA 2625 – 2633.  Indeed, Page conceded during the proceedings that the documents sought by Chevron "should have been produced long ago, when the production was ordered through Donziger."  JA 2631.

The court emphasized that the Ecuadorian judgment was a fraud and that Page played a key role in procuring the fraudulent judgment.  The court stated: "Chevron has shown to anyone with common sense that this [Ecuadorian judgment] is a blatant cut and paste exercise" from documents "internal to [the Ecuadorian Plaintiffs'] counsel" that were "incorporated into [the] judgment. . . . [T]he parroting of that information . . . leaves me with no doubt that something is going on, something is amiss there."  JA 2632.

The court noted Page's failure to offer any coherent explanation for how his work product somehow reappeared verbatim in the Ecuadorian judgment despite not having been filed in the court record: "[T]he failure or should I say more accurately the inability for the Ecuadorian Plaintiffs or Mr. Page to identify a single explanation in that record at this time, after the passage of this much time, doesn't help." JA 2632. The court elaborated:

> We are still left more than a year-plus later using speculative terms, suggesting that the information at issue could have derived from other sources. Yet Chevron points to six documents internal to [the Ecuadorian Plaintiffs'] counsel, two of which were drafted by Mr. Page, as being incorporated into that judgment. As I stated in the related case, there is ample evidence of the existence of a fraudulent scheme in that these documents bear close relationship to it. . . . And the actual knowledge of Mr. Page as an individual in this exercise is not required, but it looks pretty close to it. And I do find that there is substantial extrinsic evidence of wrongdoing.

JA 2632 – 2633. Accordingly, the magistrate judge rejected Page's effort to withhold documents on the basis of privilege. JA 2633.

The district court overruled Page's objections and affirmed the magistrate judge's order in full. JA 16.

19

## SUMMARY OF ARGUMENT

**I.**    The privilege issues were ripe for determination.  The magistrate judge had already resolved the same privilege issues in his prior ruling.  The court thus acted well within its discretion in rejecting Page's effort to further delay the proceedings through another round of briefing addressing issues that had already been decided.  Moreover, Page's opposition to Chevron's application expressly raised his privilege claims as grounds for denying the application.  Page cannot now complain that the magistrate judge reached the very arguments Page himself presented in his opposition brief and asked the magistrate judge to decide.

**II.**    The magistrate judge found privilege waiver on three independent grounds.  That ruling was correct and should be affirmed.

A.    The Donziger waiver encompasses the documents in Page's possession.  At all relevant times Page worked for Donziger and under his direct supervision.  If a partner in a law firm waives privilege, that waiver obviously applies to documents possessed by the associates and interns working on the case under his or her direction.  Indeed, Page *admitted* that the documents sought by Chevron's subpoena "should have been produced long ago, when the production was ordered through Donziger."  JA 2631.  Page's contention that Donziger's waiver was "involuntary" is contradicted by Judge Kaplan's express finding that the waiver was the direct and foreseeable result of Donziger's "voluntary and

20

deliberate choice" not to timely produce a privilege log in an attempt to seize an "improper" tactical advantage in the litigation. *See Chevron Corp. v. Donziger*, No. 11 Civ. 0691, 2013 U.S. Dist. LEXIS 55877, at *14-15 (S.D.N.Y. Apr. 12, 2013).

B.    The crime-fraud exception provides an additional basis for waiver. Chevron established far more than the prima facie case of fraud necessary to invoke the exception. As the magistrate judge found, the Fusion Memo drafted by Page — which was not part of the Ecuadorian court record — nonetheless reappeared in the judgment of the Ecuadorian court, and to this day neither Page nor the Ecuadorian Plaintiffs have ever offered a coherent explanation for how this could have happened absent fraud. JA 2632 – 2633. Page's argument that the magistrate judge should have conducted an *in camera*, document-by-document review is misplaced. This Court has held that where, as here, there is substantial extrinsic evidence of fraud, the district court has the discretion to conclude that a document-by-document review is unnecessary. *In re Grand Jury Proceedings*, 33 F.3d 342, 350-51 (4th Cir. 1994). Moreover, *all* of Page's work for Donziger was in furtherance of the fraudulent Ecuadorian litigation and judgment, and this Court has held that a document-by-document review is unnecessary in that circumstance. The magistrate judge's invocation of the crime-fraud exception is consistent with

21

the rulings of the other federal courts that have reviewed the same evidence and found substantial evidence of fraud by Donziger and the Ecuadorian Plaintiffs.

C.    The magistrate judge correctly found subject-matter waiver based on Donziger's and Page's disclosures to third parties, such as the purportedly neutral "expert" Cabrera, Amazon Watch, and the *Crude* film crew.  These disclosures were inconsistent with maintaining confidentiality.

## STANDARD OF REVIEW

Where, as here, a district court's "conclusions as to the non-existence of any attorney-client privilege . . . rest essentially on determinations of fact," this Court reviews those findings for clear error.  *Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F.3d 120, 123 (4th Cir. 1994).  A factual determination is clearly erroneous only when the Court is "left with the definite and firm conviction that a mistake has been committed."  *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 338 (4th Cir. 2005) (internal quotation marks omitted).  Likewise, a district court's determination of the applicability of the crime-fraud exception to attorney-client privilege will not be reversed "absent a clear showing of abuse of discretion."  *See In re Grand Jury Proceedings*, 33 F.3d at 348.  To the extent the district court's privilege ruling rests on legal principles, it is reviewed *de novo*.  *In re Grand Jury Subpoena*, 341 F.3d 331, 334 (4th Cir. 2003).

## ARGUMENT

### I.    THE PRIVILEGE ISSUES WERE RIPE FOR DETERMINATION.

Page argues that the magistrate judge erred in resolving the privilege issues rather than ordering a new round of briefing and argument. Page Br. 16-18. He is mistaken.

First, Page ignores that the magistrate judge had already resolved Page's baseless privilege claims in his prior ruling in the related case. The court was under no obligation to order new briefing and argument to resolve the same issues that the court had already decided. A privilege cannot be resurrected once vitiated. *Genentech, Inc. v. ITC*, 122 F.3d 1409, 1416-18 (Fed. Cir. 1997) ("Once the attorney-client privilege has been waived, the privilege is generally lost for all purposes and in all forums."); *In re Weiss*, 596 F.2d 1185, 1186 (4th Cir. 1979) (rejecting argument that waiver of attorney-client privilege was limited to a particular proceeding). Page does not claim that he intended to offer new or different privilege arguments; indeed, he concedes in his brief that the district court "ha[d] the benefit of [Page's] privilege log provided in" the related case. Page Br. 41. Page's goal was clear: to delay the proceedings by forcing the parties and the court to undergo an additional round of litigation to rehash the same issues that had already been decided against him. The magistrate judge did not abuse his discretion in denying Page's effort to stonewall discovery.

23

Second, Page raised the privilege arguments himself in his opposition to Chevron's discovery application. In fact, he made the privilege arguments the centerpiece of his opposition. JA 802 – 824. Page argued that Chevron's application should be denied because the documents were supposedly protected by the attorney-client privilege and entitled to work product protection. *Id*. Thus, the magistrate judge resolved the very arguments and defenses that Page asked him to resolve. Page claims that presenting these arguments was "necessitated" by the fact that the magistrate judge had previously resolved the same arguments against him, Page Br. 17, but having made the strategic decision to present these arguments in his opposition brief, he cannot now complain that the magistrate judge abused his discretion by doing what Page invited him to do.

This Court has never required district courts to take the "two-step" approach Page proposes here, and deciding the proper approach to resolving privilege issues in a particular case falls well within the ample discretion afforded district courts in this area. Indeed, other courts have handled privilege questions the same way the court did here. For example, in *Chevron Corp. v. Camp*, Nos. 10-mc-27,-28, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010), the court decided privilege claims when

granting a § 1782 application, rejecting the two-step approach Page proposes.  *See id*. at *5.[6]

## II.    THE MAGISTRATE JUDGE DID NOT ABUSE HIS DISCRETION IN FINDING THAT PRIVILEGE HAD BEEN WAIVED ON MULTIPLE GROUNDS.

The magistrate judge determined that the Donziger privilege waiver encompassed the documents held by Page, who worked as Donziger's intern and associate on the Lago Agrio litigation.  The magistrate judge also concluded that the crime-fraud exception provided an additional and independent basis for waiver.  Finally, the magistrate judge found a subject-matter waiver based on disclosures to third parties by Page and the Ecuadorian Plaintiffs.  All of those determinations were correct and the judgment below may be affirmed on multiple grounds.

### A.    The Donziger Waiver Encompasses Page, Who Worked Under Donziger's Direction On The Ecuadorian Litigation.

**The Donziger Waiver**.  In connection with a proceeding under 28 U.S.C. § 1782, Chevron served Donziger with a subpoena in the Southern District of New

---

6  Page's reliance on *Olvera v. County of Sacramento*, No. Civ. S-10-0550, 2011 U.S. Dist. LEXIS 144598 (E.D. Cal. Dec. 15, 2011), is misplaced.  In that case, the court declined to extend its application of the crime-fraud exception "to other discovery in this matter, which has not yet been propounded."  *Id*. at *4-5 n.2.  Likewise, the fact that Chevron proposed a different approach in a different case (Page Br. 17) does not help Page.  In that case, Chevron did not have the opportunity to present privilege arguments before the subpoena issued.  Here, Page did.

25

York on August 9, 2010.  Donziger moved to quash the subpoena on burden and privilege grounds, but failed to submit a privilege log.  Judge Kaplan held that Donziger had therefore waived any applicable privilege or protection pursuant to Federal Rule of Civil Procedure 26(b)(5) and Local Civil Rule 26.2 of the Southern and Eastern Districts of New York.  *See In re Chevron Corp.*, 749 F. Supp. 2d 135, 140 (S.D.N.Y.), *aff'd sub nom Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

The court stated, however, that it would consider relieving Donziger of the waiver "[p]rovided that Donziger files a complete privilege log on or before October 29, 2010."  749 F. Supp. 2d at 140 n.17.  Donziger missed that deadline as well.  On November 15, 2010, he filed a "purported privilege log — which [was] over 2,000 pages long and claim[ed] privilege as to 8,652 documents . . . [yet] list[ed] not even one document that was written by or addressed to any of the Lago Agrio plaintiffs — the clients whose privilege supposedly is being asserted."  *See In re Chevron*, 749 F. Supp. 2d 170, 173 (S.D.N.Y. 2010), *aff'd*, 409 F. App'x 393.

Judge Kaplan thus adhered to his determination that Donziger had waived any applicable attorney-client privilege or work product protection.  749 F. Supp. 2d at 185.  He found that Donziger's failure to submit a privilege log was neither an oversight nor an innocent mistake.  To the contrary, he explained, it "was a deliberate attempt to structure the response to [Chevron's] subpoenas in a way that

would create the maximum possibility for delay," with the goal of obtaining a judgment against Chevron in Ecuador before Chevron got the documents responsive to the subpoena. *Id.* at 185. Judge Kaplan emphasized that "the tactical advantage that Donziger and the Lago Agrio plaintiffs have gained and the disadvantage to which they have put their adversaries was not simply a consequence of errors made and positions taken for benign reasons." *Id.* at 184. Rather, it was a knowing and calculated attempt "to achieve that tactical advantage at their adversaries' expense" — a conclusion reinforced by the many frivolous assertions of privilege in Donziger's untimely privilege log that suggested "that Donziger and the Lago Agrio plaintiffs are not operating in entire good faith." *Id.*

The Second Circuit conducted "an independent review of the record" and affirmed Judge Kaplan in full. *See Lago Agrio Plaintiffs*, 409 F. App'x at 395. The court concluded its decision by praising Judge Kaplan for his resolution of the privilege waiver issues, stating:

> [W]e wish to note the exemplary manner in which the able District Judge has discharged his duties. There is no question but that all concerned, not least this Court, are well served by the careful and comprehensive analysis which is evident repeatedly throughout the many memoranda and orders of the District Court, many of which were produced with rapidity in the context of the District Court's daunting schedule in this and other important cases."

*Id.* at 396.  Page, remarkably and wrongly, asserts that the Second Circuit offered only a "tepid" endorsement of Judge Kaplan's ruling.  Page Br. 31.  But he offers no reason why this Court should disagree with the Second Circuit's conclusion that Judge Kaplan got the privilege waiver issue exactly right.

Judge Kaplan's order directed Donziger to produce not only those documents in his possession, but also those documents under his control.  *See* JA 2956 ("Donziger's obligation was and remains to produce 'forthwith' not only those documents responsive to the subpoena that were within his possession or custody, but also those that were within his control. . . .[T]o the extent that any such documents within his control have not been produced, they must be produced forthwith.").

**The Donziger Waiver Applies To Page**.  The magistrate judge correctly determined that Donziger's waiver encompasses documents possessed by Page.  There is no dispute that Page was functioning initially as Donziger's intern — and later as his junior associate — and worked on the Lago Agrio litigation at his direction and under his direct supervision.  *See* JA 294 ("it is clear to me that all of the work that was performed here was performed under Mr. Donziger"); JA 1206 (Page declaration that he worked with Donziger "as a law student under his supervision, and as a practicing attorney retained by him and his clients, for over six years").  Page continues to this day to work for Donziger.  JA 1208.

Because there existed a single privilege between Donziger's law firm and its clients — rather than multiple privileges running between each individual lawyer at Donziger's firm and its clients — the Donziger waiver applies to documents held by Page. As the magistrate judge explained, "[i]t's not as if the privilege is somehow protected because [Donziger] may have 5 other people in 5 other states working under his direction." JA 295. To the contrary, it makes "no difference here, because they're working on the same case, they're working under his direction with respect to the same crime." *Id.*; *see also, e.g.*, *Fonar Corp. v. Johnson & Johnson*, 227 U.S.P.Q. 886, 887 (D. Mass. 1985) ("One waiver thus waives the privilege as to all the lawyers working jointly on the matter.").

It is self-evident that a senior lawyer cannot evade a court order compelling the production of documents in his possession by claiming that documents in the possession of his associates and interns are outside of his control. If that were the law, the senior lawyer would simply walk down the hall and hand off his case file to his associate. No court has ever approved this sort of tactic.

In fact, Judge Kaplan has rejected the exact argument Page advances here. Judge Kaplan held that the order requiring Donziger to produce his documents encompassed the documents held by Page. *See In re Chevron Corp.*, No. 1:10-mc-00002-LAK, D.E. 199 (S.D.N.Y. Aug. 16, 2011) (holding that Donziger should have produced documents held by his former interns). Moreover, Judge Kaplan

29

recently held that Donziger's waiver extended to a lawyer who, like Page, worked for Donziger on the Lago Agrio litigation. *See Donziger*, 2013 U.S. Dist. LEXIS 55877 at *26 ("This Court finds that Donziger controlled the documents in [the other lawyer's] possession and therefore waived privilege as to all of them."). Judge Kaplan described the claim that the waiver did not extend to this lawyer as "especially baseless," pointing out that, like Page, she was an attorney who at all relevant times worked under Donziger's supervision. *See id.* at *25 (citing with approval Magistrate Judge Day's ruling concerning Page); *see also Chevron Corp. v. Salazar*, 275 F.R.D. 437, 447-50 (S.D.N.Y. 2011) (waiver applies to Donziger's co-counsel).

In this proceeding, the magistrate judge reached the same common-sense conclusion. He explained that "[t]his material was required to be produced long before in large measure under the Donziger action." JA 2631. Indeed, Page himself conceded that the documents in his possession should have previously been produced in response to the production order directed to Donziger. *See* JA 2625 ("Mr. Page has conceded that Mr. Donziger had the right, the authority, and the ability to obtain and produce the documents that are sought in this present action."); JA 2625 – 2626 ("Mr. Page does not dispute that his documents should have been produced in Mr. Donziger's production."); JA 2631 ("Page was working for Donziger, working for him, and has conceded that all of the materials in

30

question should have been produced long ago, when the production was ordered through Donziger.").  Page's claim that he may withhold the documents notwithstanding his admission that they should previously have been produced in response to a federal court order is improper and wrong.

**Page's Objections Are Meritless**.  Page first contends that Donziger's waiver was "compelled" and not "voluntary."  Page Br. 27-31.  But this is not so. As Judge Kaplan explained, Donziger made "a voluntary and deliberate choice" not to produce a privilege log "for an improper reason":  to delay and obstruct discovery, and gain an unfair tactical advantage:

> As there was abundant (if not unanimous) case law holding that the
> failure to supply a privilege log *when required* would or could waive
> any claims of privilege, Donziger's intentional failure to do so,
> especially for the purpose of gaining a tactical advantage, constituted
> a *voluntary* waiver.  He and his clients must be deemed responsible
> for the natural and predictable consequences of his intentional failure
> to act.

2013 U.S. Dist. LEXIS 55877, at *14-15 (footnote omitted).  Page consigns Judge Kaplan's decision to a footnote, in which he does not identify any actual errors in the ruling, but simply asserts that this Court "should not give weight" to the ruling because it purportedly does not contain "a thorough analysis of privilege," even though Judge Kaplan devoted several pages to analyzing and rejecting the same privilege arguments Page presents here.  *See* Page Br. 32 n.68.

31

The cases Page relies upon do not support his position. In both *International Union of Operating Engineers v. Philip Morris, Inc.*, No. Civ. A. 3:97-0708, 1999 WL 33659387 (S.D. W.Va. June 28, 1999), and *Leonen v. Johns-Manville*, 135 F.R.D. 94 (D.N.J. 1990), the parties avoided waiver by acting diligently and taking the legally necessary steps to maintain the confidentiality of their documents. Here, in contrast, Donziger *defied* his legal obligations in an attempt to seize an improper tactical advantage. Page also likens this case, erroneously, to *Transamerica Computer Co. v. IBM Corp.*, 573 F.2d 646 (9th Cir. 1978). In *Transamerica*, the court held that IBM did not waive privilege when it inadvertently produced some privileged documents during an expedited discovery process. *See id.* at 651 (agreeing that "under the rather extraordinary circumstances of the accelerated discovery proceedings . . . IBM's inadvertent production there of a limited number of privileged documents was, in effect, 'compelled,' and therefore no waiver of the privilege could be predicated upon such involuntary production"). Here, in contrast, the waiver was *not* inadvertent, but rather was the predictable and direct consequence of Donziger and the Ecuadorian Plaintiffs' bad-faith effort to obtain a tactical advantage by failing to file a privilege log as required under the local rules.

Even if Page were correct that Donziger's waiver was not "voluntary," it would make no difference. That is because, as both Judge Kaplan and the

magistrate judge concluded, Page's documents should have been produced pursuant to the order directing Donziger to produce documents under his control. Page's "involuntary waiver" argument rests on the fiction that the Donziger proceeding and the Page proceedings are completely separate and distinct — and that a waiver in one case cannot be "imported" into the others. *See* Page Br. 27-28 (arguing that "compliance with a judicial order in one proceeding does not vitiate privilege in a separate proceeding"). But the only reason there are "separate" proceedings is that Donziger and Page refused to produce documents encompassed by the order directed to Donziger, thus requiring Chevron to pursue the instant actions against Page himself. Donziger and Page cannot circumvent the waiver ruling by refusing to produce documents covered by the order against Donziger, forcing Chevron to file separate actions against Page, and then claiming that the Donziger waiver no longer applies because these are "separate" proceedings.

Next, Page argues that the magistrate judge's ruling conflicts with what he describes as "the Second Circuit's caution against expanding the order [against Donziger] to non-emergent discovery requests." Page Br. 31-35 (capitalization altered). This argument is misplaced because, as explained above, the magistrate judge did not "expand" the order against Donziger; to the contrary, he determined that Page's documents should have been produced pursuant to that order. *See* JA 295 (reasoning that because Page worked under Donziger's direction, "[t]here is no

reason for the documents that were in [his] possession not to have been produced with the other Donziger materials"); *accord* 2013 U.S. Dist. LEXIS 55877, at *13 (statement of Judge Kaplan that Donziger should have produced documents from his associate's files, and noting that "if Donziger simply complied with the order to which he has long been subject, the controversy regarding these subpoenas would be moot").

Moreover, Page mischaracterizes what the Second Circuit said. In his brief, Page states that the Second Circuit said "the district court *should*" permit a more probing review of the privilege issues if time permitted. Page Br. 31 (emphasis added). What the Second Circuit *actually* said is the district court "may wish to" allow a more searching review in that circumstance. 409 F. App'x at 396. Thus, the Second Circuit made clear that whether to conduct a closer review was within the district court's discretion. Page has mischaracterized the Second Circuit's opinion in order to create the false impression that the court *ordered* a closer review. In any event, Chevron demonstrated the time sensitivity of its requests, explaining that it faced a short deadline for submitting documents in the treaty arbitration and that even counsel for the Ecuadorian Plaintiffs conceded that a ruling in the Ecuadorian litigation was imminent. *See* JA 2583; D.E. 60 at 25-26 (identifying exigent circumstances with regard to both the treaty arbitration and the Ecuadorian litigation).

34

Finally, Page argues that the Donziger waiver should extend no later than October 20, 2010, the date on which Judge Kaplan first found waiver. Page Br. 36-37. That assertion is baseless. The waiver imposed by Judge Kaplan did not have an end date of October 20, 2010, a fact that was confirmed by the parties' conduct after that date. In particular, Donziger produced thousands of documents dated <u>after</u> October 20, 2010, including producing entire "images of computer hard drives in Donziger's possession, custody or control" in late January 2011 — more than three months after the waiver order. JA 1690; JA 3057. Included in the hard drives Donziger produced was the hard drive of his associate Andrew Woods. Those hard drives contained documents dated as late as January 28, 2011. Judge Kaplan, in issuing an order in January 2011 requiring Donziger to turn over his hard drive, JA 3056 – 3057, and in issuing an order in August 2011 requiring Donziger to produce all documents within his "control" based on the waiver, did not limit the waiver to documents created before October 20, 2010. JA 2955 – 2956.

Even accepting Page's claim that documents from the post-October 20 time period were not subject to the waiver and remained privileged, that privilege has been waived by Donziger's having produced documents from that time period without making any claim of privilege. *See Sheet Metal Workers Int'l Ass'n v.*

*Sweeney*, 29 F.3d 120, 125 (4th Cir. 1994); *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981).

### B.    The Crime-Fraud Exception Provides An Additional And Independent Basis For Waiver.

The judgment below can be affirmed on the alternative ground that disclosure is warranted under the crime-fraud exception to the attorney-client privilege and work product protection.  The crime-fraud exception to the attorney-client privilege is triggered upon a prima facie showing that (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud.  *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999).  The crime-fraud exception to work product protection is triggered when these factors are met and when the party seeking the information makes a prima facie showing that the attorney was "aware of" the crime or fraud.  *In re Grand Jury Proceedings #5*, 401 F.3d 247, 252 (4th Cir. 2005).  A district court's crime-fraud determination will not be reversed "absent a *clear* showing of abuse of discretion," *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994) (emphasis added), and Page comes nowhere close to demonstrating a clear abuse of discretion here.

### 1.    The Evidence Of Fraud Is Overwhelming.

Chevron established far more than the necessary prima facie case of fraud. Among other things, it demonstrated that the Ecuadorian Plaintiffs' lawyers and consultants ghostwrote the judgment of the Ecuadorian court — and that Page played an integral and knowing role in the scheme.  As the magistrate judge explained in his ruling in the related case, the evidence showed that the Fusion Memo drafted by Page appeared verbatim in the court's opinion:

> I do think that probable cause has been established if for no other reason than for the production of the admittedly co-authored, or documents co-authored by the Pages, which has found its way into the decision by the Ecuadorian court, buttressed at least by the submission by plaintiff, I'm sorry, the movant here or the analytical report of their expert, shown to me in a presentation to me that was very effective and certainly supported by the submissions to the court, that it is a virtual line-by-line entry on many occasions.

JA 301.  The magistrate judge reiterated this point in addressing the second subpoena:

> The parroting of that information . . . leaves me with no doubt that something is going on, something is amiss there. . . . Chevron has shown to anyone with common sense that this is a blatant cut and paste exercise.

JA 2632; *see also* JA 548 – 550, 981 – 1995, 2990 – 2991 (evidence of Page's role in preparing the Draft Alegato, portions of which also appeared in the Ecuadorian court's judgment).

And that was just the tip of the iceberg.  Chevron also introduced evidence that:

- The Ecuadorian Plaintiffs, through their attorneys and consultants, forged the reports of their own expert, Charles Calmbacher, after Calmbacher's conclusions did not match their expected results.  Instead of filing the reports that Calmbacher provided them, they affixed his signature to reports they had drafted instead.  JA 629 – 630; *Donziger*, 768 F. Supp. 2d at 636 ("The [Ecuadorian Plaintiffs], through their counsel, submitted forged expert reports in the name of Dr. Calmbacher.").

- The Ecuadorian Plaintiffs, through their attorneys and consultants, secretly arranged for the Ecuadorian court to appoint Richard Cabrera as the purportedly "independent" court expert and then hired U.S.-based consultants to ghostwrite his report.  They later concealed their fraudulent scheme by having Stratus Consulting, the true authors of the Cabrera report, prepare false "objections" to it, which Stratus then responded to in a supplemental report, again under the name of Cabrera. *See* JA 484; JA 2348 – 2350; *Donziger*, 2013 WL 5575833 at *5-7, *15;

38

*Donziger*, 886 F. Supp. 2d at 289 ("There is no genuine issue with respect to the facts that the [Ecuadorian Plaintiffs'] team secretly prepared [Cabrera's] work plan, worked closely with him in carrying it out, and drafted most of the report and its annexes. . . . This uncontradicted evidence demonstrates that the report and subsequent responses filed in Cabrera's name were tainted by fraud."). The Stratus employees have now disavowed the report and its findings under oath, explaining that they had been misled by Donziger. *See Chevron Corp. v. Donziger*, No. 11 Civ. 0691, D.E. 1007-1 at Ex. 3652, ¶¶ 15, 57, 73, 76 (S.D.N.Y. Apr. 12, 2013); *id.* at Ex. 3653, ¶¶ 8-9, 13-15, 27, 38, 50.

- When the Cabrera fraud was in the process of being revealed, the Ecuadorian Plaintiffs and Donziger, aided by other counsel, including the Patton Boggs law firm, decided to (in their words) "cleanse" the Cabrera report. To that end, they hired new experts to "address Cabrera's findings in such a subtle way that someone reading the new expert report (the Court in Lago or an enforcement court elsewhere) might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages." JA 1997 – 1999 (Ecuadorian Plaintiffs' counsel outlining plan to "'cleanse' any perceived impropriety related to the Cabrera Report"); JA 2975 – 2978 (Ecuadorian Plaintiffs' counsel stating that "we

did not want to take a position that could compromise our ability to cleanse the record in ecuador [sic]"); JA 1922 (Ecuadorian Plaintiffs' counsel circulating a draft filing that "balances the desire for a 'cleansing' of some sort with the need to avoid creating any impression that what we describe here is an exhaustive list of the submissions to/contacts with Cabrera"); *see also Donziger*, 886 F. Supp. 2d at 260-62 (describing the cleansing process).

- The Ecuadorian Plaintiffs, through their attorneys and consultants, engaged in a systematic pressure campaign based on misinformation, which included collusion with the Ecuadorian government to pressure the Ecuadorian court to rule against Chevron and to indict TexPet's attorneys to exert additional pressure on Chevron. *See* JA 262; JA 2597 – 2598; *Donziger*, 768 F. Supp. 2d at 614-16.

In this case, the magistrate judge relied on this extensive record of fraud, not only meticulously detailed by many other federal courts, but also shown in the voluminous evidence submitted directly to the court by Chevron,[7] to find "substantial extrinsic evidence" of wrongdoing. JA 2633.

---

7  *See, e.g.*, JA 36 – 41; JA 349; JA 355 – 357; JA 371 – 383; JA 394 – 425; JA 349 – 455; JA 484 – 495; JA 527 – 529; JA 531 – 559; JA 561 – 580; JA 588 –

[Footnote continued on next page]

Page has little to say in response, arguing that fraud is not the *only* possible inference that the court could have drawn from the fact that significant portions of his unfiled work product reappeared verbatim in the opinion of the Ecuadorian court. Page Br. 22-23. Page speculates that "[t]he Ecuadorian trial court could [ ] have borrowed the relevant language via a number of non-nefarious means" or might have "taken the language from a press packet." The court found these arguments "speculative" and "lacking in persuasion." JA 2632. Indeed, in the more than two years since Chevron first demonstrated that Page's Fusion Memo was copied into the judgment, Page has never been able to offer an explanation for how his work reappeared verbatim in the judicial opinion. If there were any documents in the record that could explain the plagiarized text in the judgment, Page or the Ecuadorian Plaintiffs would have identified them long before now. The magistrate judge's conclusion that Page helped ghostwrite the opinion is not

---

[Footnote continued from previous page]

594; JA 606 – 623; JA 628 – 630; JA 1850 – 1851; JA 1912 – 1914; JA 1922; JA 1932 – 1934; JA 1981; JA 1997 – 1999; JA 2010 – 2012; JA 2018 – 2020; JA 2143 – 2144; JA 2214 – 2217; JA 2223 – 2225; JA 2239 – 2245; JA 2247 – 2300; JA 2302 – 2306; JA 2348 – 2350; JA 2391 – 2394; JA 2418 – 2423; JA 2564 – 2569; JA 3103 – 3104.

just a *permissible* inference, it is the *only* conclusion that can be drawn in light of

the overwhelming evidence of fraud.[8]

Page also argues that the magistrate judge did not conduct his own

evaluation of the evidence, but rather "relied almost exclusively upon" the findings

of Magistrate Judge Francis. Page Br. 19. Page's argument is baseless. The

magistrate judge conducted his own independent analysis of the evidence, *see* JA

302, and subsequently confirmed twice on the record that his findings were

independent. *See* JA 2631 – 2633; JA 3541. For this reason, Page's reliance on

*Chevron Corp. v. Weinberg Group*, 682 F.3d 96 (D.C. Cir. 2012), is misplaced.[9]

---

[8] Page cites Ecuadorian Judge Nicolas Zambrano's claim that he is "the only author of the [Lago Agrio] judgment." Page Br. 23 n.46 (internal quotation marks omitted). This assertion lacks credibility in light of the declaration of Alberto Bastidas Guerra, who describes in detail how Judge Zambrano successfully solicited and executed an arrangement by which the Ecuadorian Plaintiffs' attorneys paid him and Judge Zambrano $500,000 in exchange for the opportunity to draft the judgment, which Judge Zambrano would "sign[] and issu[e] as his own" (JA 2993 – 3000) and that it was "through [Judge Zambrano] that I found out that the attorneys for the [Ecuadorian] Plaintiffs had written that judgment." JA 2998. Equally misplaced is Page's reliance on the "finding" of the Ecuadorian court itself, Page Br. 23, a statement that cannot be credited given the overwhelming evidence of collusion between the Ecuadorian Plaintiffs and the judiciary.

[9] Moreover, while the D.C. Circuit questioned whether the factual findings at issue in *Weinberg* remained valid in the wake of *Salazar*, Judge Kaplan has since answered that question in the affirmative, reaffirming repeatedly all of the prior fraud findings. *See Donziger*, 2013 WL 5575833; *see also Chevron Corp. v. Donziger*, No. 11 Civ. 0691, 2013 WL 1087236 (S.D.N.Y. Mar. 15, 2013);

[Footnote continued on next page]

The magistrate judge's conclusion is buttressed by the findings of other courts that have considered the same evidence that was before the court in this case. For example, Judge Kaplan has held that:

> [T]here is probable cause to suspect, and often stronger evidence, that [r]epresentatives of the [Ecuadorian Plaintiffs] bribed the Ecuadorian judge to obtain the result they wanted and, as part of the deal, wrote the Judgment to which the judge put his name. Indeed, there is substantial evidence corroborating this assertion, not least of it the fact that significant parts of the Judgment match — word-for-word — internal work product documents of the [Ecuadorian Plaintiffs] that never were publicly filed in the Lago Agrio case.

*Donziger*, 2013 WL 1087236, at *2 (footnote omitted). Similarly, a federal court in Florida determined that "Chevron has obtained mounds of evidence . . . that suggests that the judgment itself was also ghostwritten. For example, a forensic document analysis conducted on the judgment revealed that it contains verbatim passages that were taken from various pieces of the [Ecuadorian Plaintiffs] lawyers' internal, unfiled, work product." *In re Chevron Corp*., No. 11-24599-cv, 2012 WL 3636925, at *2 (S.D. Fla. June 12, 2012) (citation omitted). In sum, the magistrate judge's conclusion that Chevron demonstrated a prima facie case of

---

[Footnote continued from previous page]
> *Chevron Corp. v. Donziger*, No. 11 Civ. 0691, 2013 WL 646399 (S.D.N.Y. Feb. 21, 2013); *Donziger*, 886 F. Supp. 2d 235.

fraud is supported by overwhelming evidence and Page comes nowhere close to making the "clear showing of abuse of discretion," *In re Grand Jury Proceedings*, 33 F.3d at 348, necessary to overturn it.

### 2. Page's Demand For An In Camera, Document-By-Document Review Is Misplaced.

Consistent with his effort to protract and delay the proceedings, Page contends that the magistrate judge should have conducted an in camera, document-by-document review to confirm that each of his documents was related to the fraud.  Page Br. 24-27.  But this Court has held that whether to conduct an in camera review is committed to the sound discretion of the district court — and that where, as here, there is evidence of crime or fraud extrinsic to the documents, in camera review is not necessary.

In *In re Grand Jury Proceedings*, 33 F.3d at 350-51, this Court affirmed the district court's decision not to conduct a document-by-document review when the crime-fraud exception had been established by other evidence.  *See also Shahinian v. Tankian*, 242 F.R.D. 255, 258-59 (S.D.N.Y. 2007) (in camera review "unhelpful in resolving the applicability of the crime/fraud exception"); *United States v. Kaplan*, No. 02 Cr. 883, 2003 WL 22880914, at *10 (S.D.N.Y. Dec. 5, 2003) (concluding that in camera review was unnecessary because it is "a discretionary

alternative to establishing the crime-fraud exception with independent evidence").[10]

Here, the magistrate judge relied on the abundant extrinsic evidence of fraud in declining to conduct an in camera review. He explained: "I do find that there is substantial extrinsic evidence of wrongdoing. . . . I do not find an in camera review is required under the decision of *In re Grand Jury Proceedings* found at 33 F.3d. 342." JA 2633. Given the overwhelming evidence of fraud discussed above, the magistrate judge's conclusion that a document-by-document review was unnecessary fell well within his broad discretion in this area.

Moreover, document-by-document analysis is not necessary where, as here, the lawyer was retained to perpetrate a fraudulent scheme. *See In re Grand Jury Investigation*, 352 F. App'x 805, 809-10 (4th Cir. 2009) (per curiam) ("[T]he Corporation sought Counsel's legal advice for the sole purpose of facilitating its scheme to defraud the United States. Therefore, *all* of the withheld documents

---

[10] The verbatim copying of text from Page's "Fusion Memo" into the $19 billion judgment demonstrates why in camera review is particularly unhelpful in cases like this where the fraud evidence is extrinsic to the documents sought. There can be no serious dispute that Chevron has presented prima facie evidence of fraud involving the Ecuadorian Plaintiffs' participation in authoring the Ecuadorian judgment. And there can be no dispute that Page's Fusion Memo, text from which actually appears in the judgment, bears a close relationship to the fraud. Yet in camera review of the Fusion Memo alone would not have assisted the Court in assessing that document's central role in the fraud.

45

bear the requisite close relationship to the alleged violation . . . because they were in furtherance of the fraudulent scheme.") (emphasis added).  Here, the magistrate judge expressly determined that all of Page's work was performed for Donziger. JA 2631; *see also* JA 294 ("*all* of the work that was performed here [by Page] was performed under Mr. Donziger") (emphasis added).  In short, "there is ample evidence of the existence of a fraudulent scheme [and] these documents bear close relationship to it."  JA 2632.

Page participated in the Ecuadorian Plaintiffs' plan to pressure the Ecuadorian court to discontinue the required judicial inspections and appoint Cabrera.  JA 1932 – 1934.  He drafted documents that appear verbatim in the Ecuadorian court's opinion, although they appear nowhere in the Lago Agrio record.  JA 531 – 559; JA 273; JA 1367.  He assisted in the Ecuadorian Plaintiffs' collusion with the Republic of Ecuador's attorneys to assert a fraud claim against Chevron in related litigation and in pushing the Republic of Ecuador to indict Chevron's attorneys based on that same fraud claim, later dropped for lack of evidence.  JA 262.  Page also worked behind the scenes to instigate a trumped-up Foreign Corrupt Practices Act investigation of Chevron — an effort that Page himself understood to be a "stretch."  JA 355.  Even though he knew the charges would be baseless, Page stated:  "But journalists and even [Chevron] people aren't likely to be as sophisticated and see through the construction as easily."  JA 355.

Donziger also directed Page to draft a memorandum to "the winston boys," pushing them to "paint chevron as a lying manipulative, dishonest company" in pleadings drafted by Winston & Strawn.  D.E. 13-65.  Other evidence of Page's integral and knowing role in the fraud is set forth in the Joint Appendix.  *See, e.g.*, JA 36 – 51.[11]

In short, it is "abundantly evident that a fraudulent scheme existed;" that Page, "in the day-to-day fulfillment of [his] duties," was employed "to perpetuate that scheme;" and that through his "complete involvement," he "furthered the fraudulent operation as a whole."  *United States v. Cohn*, 303 F. Supp. 2d 672, 678, 683 (D. Md. 2003).

### C.    The Magistrate Judge Correctly Found Waiver Based On Disclosure To Third Parties.

As an additional basis for waiver, the magistrate judge held that Page could not reasonably claim confidentiality because the documents had already been disclosed to third parties.  That conclusion is plainly correct.  *See Sweeney*, 29 F.3d at 125 ("Any disclosure inconsistent with maintaining the confidential nature of the

---

[11] Page does not seriously dispute that his work with Donziger was limited to the Lago Agrio litigation.  Although he asserts that he "has worked for Donziger and the Ecuadorian Plaintiffs on a wide variety of issues," Page Br. 26, the record cite he provides to support this claim is a single page of his declaration — JA 1208 — which simply does not say this.  Rather, all his declaration says is that he worked on "environmental matters" *in other jobs*.

attorney-client relationship waives the attorney-client privilege.") (internal quotation marks omitted).

As the magistrate judge recognized, the disclosure of documents to third parties can effect a subject-matter waiver, resulting in a loss of privilege not just for the documents that were disclosed but for all documents concerning the same subject matter. JA 2629; *see also* Fed. R. Evid. 502(a). Here, the magistrate judge reasonably determined that Donziger's and Page's sharing of numerous otherwise-privileged documents with third parties, including Cabrera, Amazon Watch, and the *Crude* film crew, effected a subject-matter waiver. JA 2629 ("I also find that there is a subject matter waiver due to the intentional disclosures, which requires full disclosures in the interest of fairness. . . . Whether I look to the Federal Rules of Evidence 502(a) or the law of the Fourth Circuit . . . . it would be misleading and unfair not to find that there is a subject matter waiver."). The magistrate judge's conclusion is identical to the conclusion reached by other courts. *See, e.g.*, *Chevron Corp. v. 3TM Consulting, LLC*, No. 4-10-mc-00134, D.E. 107 at 7 (S.D. Tex. Jan. 10, 2011) ("It would be fundamentally unfair for the Ecuadorian Plaintiffs to use 3TM's work product to support their positions in the report prepared for Cabrera and then attempt to shield the remainder of 3TM's work product, which may be beneficial to Chevron, from production."); *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047, 2010 WL 3923092, at *10 (D. Colo.

48

Oct. 1, 2010) ("Waiver by disclosure to Cabrera and his team compels production of documents disclosed; waiver pursuant to the sword-shield doctrine compels production of the remaining categories of documents (to which any privilege or protection could apply, in the first place).").[12]

Page does not deny that these disclosures occurred. Yet he argues that the magistrate judge did not "point[] to any evidence indicating that Mr. Page's documents were actually given to Mr. Cabrera or the *Crude* film crew." Page Br. 40. But this ignores the fact that not only did Page fail to contest this point, he also submitted to the magistrate judge a privilege log (in connection with the first subpoena) reflecting that numerous documents responsive to both subpoenas were shared with third parties, including individuals who wrote the report for Cabrera, as well as persons working for Amazon Watch. *See* JA 234.

Finally, Page argues that Chevron could not have been prejudiced by any disclosures to Cabrera because the Ecuadorian judgment supposedly did not rely on it. Page Br. 43. This is incorrect: the judgment *does* incorporate the Cabrera

---

[12] Although Page relies on *In re Chevron Corp.*, 650 F.3d 276 (3d Cir. 2011), to support his claim that the disclosures to the *Crude* film crew did not effect a subject-matter waiver, Page Br. 38, that argument is misplaced. The record demonstrates substantial communications between and among the Ecuadorian Plaintiffs, their counsel, and the filmmakers, including evidence that they colluded to remove scenes from the movie that would harm the Ecuadorian Plaintiffs' litigating position. *See Donziger*, 768 F. Supp. 2d at 604.

Report.  When the Ecuadorian Plaintiffs and their representatives realized the fraud

regarding the Cabrera Report would be revealed, they embarked on a plan to

"cleanse" the Report and to "address Cabrera's findings in such a subtle way that

someone reading the new expert report . . . might feel comfortable concluding that

certain parts of Cabrera are a valid basis for damages."  JA 1997.  The Ecuadorian

Plaintiffs succeeded in obtaining and submitting six of these "cleansing reports" to

the Ecuadorian court, some of which are explicitly referenced in the judgment.

*Donziger*, 768 F. Supp. 2d at 621 & n.202.  And in addition to the cleansing

reports, Cabrera's findings appear in the judgment directly.  For example, the

judgment's "pit count" used to calculate the $5.4 billion award for soil remediation

is taken directly from the Cabrera Report Annex H-1.  *See Chevron Corp. v.

Donziger*, No. 11 Civ. 0691, D.E. 764 ¶ 174 (S.D.N.Y. Jan. 31, 2013).  And the

judgment's potable water award of $150,000,000 is taken directly from the Cabrera

Report.  *Id* at ¶¶ 178-180.

## CONCLUSION

The judgment below should be affirmed.

Respectfully submitted,

<u>s/ Thomas H. Dupree, Jr.</u>
Peter E. Seley
Thomas H. Dupree, Jr.
Claudia M. Barrett
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

Dated:  November 1, 2013

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,**
**AND TYPE STYLE REQUIREMENTS**

1.     This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 11,805 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  November 1, 2013

                                                          s/ Thomas H. Dupree, Jr.
                                                          Thomas H. Dupree, Jr.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2013, the foregoing Brief of Appellee was served on all parties or their counsel of record through the CM/ECF system.

I also certify that eight paper copies of the foregoing Brief of Appellee will be dispatched on the next business day following the CM/ECF filing to a third-party commercial carrier for delivery to the Clerk's Office, as provided in Local Rule 25(a)(1)(B).


Dated:  November 1, 2013        s/ Thomas H. Dupree, Jr.
                                Thomas H. Dupree, Jr.